First case on the dock this afternoon is O'Connell v. O'Neill. Clause number 4-10-0695, a case assigned to this court from the 4th District. So Mr. Ginsky. You may proceed. I have the privilege of representing O'Connell who unfortunately was the victim of medical malpractice at the hands of the same defendant on two separate occasions. The first was May 4th, 2005. The second two days later when the OBGYN in question went back in and tried to correct his earlier mistake. The first operation was a relatively simple exploratory myelotomy. The mistake that Dr. O'Neill made unfortunately was to use what is described by the physicians as a monopolar ESU electrical surgical unit. The second occasion was as I've indicated two days later when Dr. O'Neill went back in and essentially performed a bowel resection with what's called a fan and steel incision. Because of the fan and steel incision, in my opinion, the doctor did not run the patient's bowel before closing. To get into a little bit more of the specifics, with respect to the exploratory myelotomy, that was done on an outpatient basis. It was done using a minimally invasive surgical technique where there are two, sometimes three, relatively short stab wounds, puncture wounds that are made by the surgeon. Trocars are induced. Trocar looks something like my pen might look. Trocars are induced into the abdomen. Actually, CO2, the gas, is insufflated into the abdomen to gain visual space. The problem, however, was the use of the monopolar electrosurgical unit. The monopolar surgical unit looks like a scalpel. It has or it conducts electricity so that when using the instrument, the surgeon is at the same time cutting and coagulating vessels. The problem that you have with the monopolar units, which the older surgeons tend to use, is that it has to be grounded. It's grounded by means of a thigh pad that's put on the patient, either the right thigh or the left thigh. Frankly, I can't remember which side it was on here. In the monopolar cases that we get involved in, the thermal injury, the burn, tends to be somewhere between the surgical site and the abdomen. The side that the grounding pad is on, because that's the purpose of the grounding pad, in order for the ESU to work so that it both cuts and coagulates, as I indicated, is electrically charged, you have to have a circuit, and the electricity runs from the monopolar scalpel to the grounding pad. So the problem that you run into is you have distant thermal injuries that are away from the site that's being operated on. We believe that that's how the injury occurred in this particular circumstance. Did you have an expert testimony that verified what you just told us? Yes. In other words, you had an expert that said it was beyond the standard of care to use a monopolar ESU? Right. We did, Your Honor. We did. And that testimony went in during your case in chief? It did, but what didn't come out on that specific topic, and that we believe is error, is the trial court's preclusion of the plaintiff, in this case me, asking questions of the defense expert on that exact point. The defense expert was a obstetrician-gynecologist from suburban Chicago named Fred Duboe, D-U-B-O-E. And Dr. Duboe, when he was proposed, indicated that he doesn't use, in these circumstances, a monopolar ESU for exactly the reasons that we encountered here. He felt that it was unsafe. Now, how this came about at the time of the trial was midway through the trial, I don't know if it was day three, day four, as the trial courts are wont to do, both sides were instructed to exchange preliminary jury instructions, and the court had an informal discussion at the conclusion of evidence one day, obviously outside the presence of the jury, but also, importantly, outside the presence of the court recorder. And then again… It was an off-the-record discussion. It was off-the-record. There was no on-the-record jury instructions conference until the close of all the evidence, even before closing arguments. And that's how it's, you know, over 25 years of trying jury cases, that's how it's always done. I've tried cases in a lot of different venues, and typically the trial court will pass the sides to exchange jury instructions. The court will have some preliminary discussions off-the-record, but you always have at the end of the trial, obviously, the formal jury instruction on the record, and it's at the end of the trial because that's when the evidence has been concluded. The jury instructions are going to have to take into account the evidence that's introduced or adduced from the witness stand. And one of the errors that was made by the trial court in this particular case was, and I admit I made a mistake, when on behalf of Ms. O'Connell, I tendered jury instructions to defense counsel. The issues instruction had failed to include this issue about the monopolar device. I picked up on that later and tendered the instruction that we had intended to tender to the trial court and ultimately to the jury. But what the judge decided was that, well, because we had this preliminary discussion early on in the case, the plaintiff was going to be precluded from tendering that instruction and, more importantly, was precluded from cross-examining the defense expert on exactly this monopolar issue that we've been discussing. Now, what's interesting about that is the expert for the plaintiff, Dr. Dan Davis, who's the head of the Department of Obstetrics and Gynecology at the University of Florida in Gainesville, Dr. Davis clearly disclosed that opinion. He was deposed on that opinion. And Dr. DuBose, the defense expert, was also deposed on that opinion. And to say, essentially, that it's more important to have a quick or a fast or an expedient trial rather than an accurate trial, it just makes absolutely no sense. Let's separate the evidentiary issue during Dr. DuBose's cross-examination from the instruction issue. Okay? Just because Dr. DuBose testified during his deposition or was disclosed as an expert on that issue, the defense doesn't have to ask him those questions during the cross-examination. That's correct. And if they don't, then cross-examination on that topic is outside of the scope. I disagree with that, Your Honor. I disagree with that. You disagree with that? I do. I do. However, the instruction is a separate issue. I think that the instruction is a separate issue, but I don't understand the rush to judge it. Dr. DuBose is still on the stand. The disclosure of this monocular issue had been made well in advance of the trial. Both sides were well aware of what the situation was. And it was easy enough for Dr. DuBose, while he's still on the stand, to answer questions posed by the defense, if they cared to pose them. But it was certainly within the purview of the plaintiff on cross-examination to say, Dr. O'Neill, on his own behalf, has testified as a 2013 F3 witness, that use of a monocular device is not below the standard of care. You're his hired expert. As a matter of fact, you won't use monocular devices. And you won't use them because of the danger posed by distant thermal energies. Isn't that true, Dr. DuBose? That's obviously proper cross-examination. And the trial court clearly cared. Did you request the opportunity to call Dr. DuBose your witness in rebuttal? No, because the testimony was excluded. But you did have an opportunity to make an offer of proof. I did. So that's in the record of what his testimony would be. It's in the record. So I think that was a clear error. But let me move on to a number of other issues in this particular case. Dr. O'Neill, the defendant, as I've indicated, is board-certified in obstetrics and gynecology. He is not board-certified in general surgery. And at the time of his first surgery, he suspected that there was some type of injury because he said to the plaintiff when she came out of recovery, I think I neck or perforated your valve and I got it closed up. The plaintiff had been taken by her closest friend to the outpatient surgery. And before he left, Dr. O'Neill said to the plaintiff's friend, there was a problem in surgery. I think I neck or perforated your valve and I got it closed up. But we had the wrong units. We had the wrong instruments. So Dr. O'Neill was very, very aware of the fact that something may have occurred during surgery. Now, two days later, when the patient is back at the ER and he has raging peritonitis, Dr. O'Neill, and this is interesting, goes back in to address the issue. And what he should have done, clearly, is consult or have a general surgeon take care of this because at that point in time, he knows he's got a perforated valve. He knows he's got contamination throughout the patient's abdomen. He knows that he's got peritonitis, this raging peritonitis. And what's very, very interesting is that O'Neill himself, the defendant, dictates in his operative note from the second procedure that his preoperative diagnosis is perforated ileum with peritonitis. In other words, he knows before he starts the operation what the severity of the situation is. Yet at no time does he ask for any assistance from a general surgeon. He never even consults a general surgeon. Rather, what he attempts to do is a resection with a re-anastomosis of the ileum that's damaged. And again, I would urge the court to look at the appendix because the appendix of plaintiff's brief has, as part of it, the actual documents from the medical record. And it's Appendix Page 8, Plaintiff's Exhibit 7 from the trial that is the operative note where Dr. O'Neill, before he goes back in the second time, specifically dictates peritonitis with probable ileal perforation. And when he gets in, and again, these are his words from the medical chart as opposed to what he testified to in his deposition, and that's an important distinction. But at the time that this was all occurring, Dr. O'Neill himself describes this resection. A resection is, as described by Dr. Davis during the course of the trial, the plaintiff's expert. A resection is, if you can imagine, you've got a garden hose and you want to remove a one-foot section of the garden hose, you cut it on both sides of the one-foot section and then splice the two pieces together. That's what a resection and a re-anastomosis is. That's what Dr. O'Neill testified that he did. Interestingly enough, at the time of his deposition, he then backs off of that and says, well, no, all that I made was a small nickel-sized elliptical incision. What's important about that is that wording appears nowhere in his dictated op-ed from the second operation. He doesn't describe the size of the specimen that he removed. He doesn't say that it was elliptical, it was nickel-sized, and all that I was doing was resuturing the undamaged portion of the mouth. If you look at the words that he used in his dictated op-ed, he clearly says on more than one occasion, I performed a bowel resection with a re-anastomosis. He doesn't have staff privileges to do that. He's not qualified to do that. That's why he wanted general surgery. Interestingly enough, in that second operation where he does this resection with the re-anastomosis, he tries to do it through a phantom spheal incision. A phantom spheal incision is a machine gun. It's low below the umbilicus, and it's generally only about two to three inches mid-width. It's for cosmetic purposes, but as testified by Dr. Davis in the case, when you know you've got perforated bowel, you never use a phantom spheal incision because, number one, you don't know exactly where in the bowel that perforation exists. You have to be able to clearly see the operative field. But more importantly, anytime that you have a bowel perforation, you have to make sure that before you close, you've addressed all of the complications with respect to that perforation because of the formation of scar tissue and infection that has spread throughout the abdomen. And as a consequence, every, every general surgeon in the United States, before closing, after doing a resection of the bowel, runs the bowel. And there is a movie starring Mel Gibson, Braveheart, where at the end, before he's executed, there's a rather dramatic reenactment of what it means to be disemboweled, and it's two dwarves, and they're using a rope. That's literally what running the bowel is. The surgeon takes the intestines of the patient out, and hand by hand, hand over hand, goes through the entire intestine, looking for all possible damage before closing the patient up. You can't do that with a bikini cut. You can't do that with a phantom spheal incision. And what's significant about that is Dr. O'Neill testified from the stand, unequivocally, that two of the physicians that testified on behalf of the patient were inhaled because they said that the patient didn't have her appendix, and this is another one of the issues that's raised in this appeal. In fact, the patient didn't have her appendix. Her appendix had been removed. If Dr. O'Neill had run the bowel, which he didn't dictate that he did, but he testified to subsequently after the lawsuit was filed, if he in fact had run the bowel, he'd have to see that the appendix was missing because it's part of the bowel. And Dr. Whelan, the general surgeon who ultimately was called in to literally save this patient's life, did a couple different things. Number one, he used a vertical midline, which you're supposed to do for bowel surgery, and he ran the bowel, evidenced by the fact that he testified and dictated I ran the bowel. And when I ran the bowel, I noticed that the patient didn't have her appendix. Let me ask you a question that's different than what you're talking about here because your issue one was the trial court refused to preserve the surgical pathology specimen, correct? That was your issue one. But the defense claims that both experts, yours and the defense, said that the failure to send that specimen to pathology did not cause it. And in your reply, you're saying you're not contending that. You're not saying that caused it. You're saying that it went to credibility. Is that correct? That's correct, Your Honor. And the clearest example that I can use by the way of analogy is let's assume rather than a medical malpractice case, we've got an intersectional collision. Well, let me just stop you. What is the issue of credibility of the doctor's testimony? Tell me how that brings this up. That's what I'm trying to answer. Okay. Let's assume that rather than a medical malpractice case, what we have before us is an intersectional collision. Both drivers claim they had the green light. Let's also assume that there's a video camera that was at that intersection that recorded the whole thing. Under the logic of the trial court in this case, the videotape would be inadmissible because the videotape sheds no light whatsoever on the cause of the plaintiff's injuries in that case. The videotape and the camera can't possibly cause the injuries to the plaintiff in that intersectional collision case. Yet that videotape is going to hold all kinds of valuable evidence in terms of who's telling the truth between the plaintiff and the defendant. Yet this trial court would hold it's irrelevant because it can't be tied up on the issue of causation. Causation is one but only one element in any lawsuit, whether it's a motor vehicle collision or whether it's a medical malpractice. And the fact that all of the testimony with respect to Dr. O'Neill's refusal to submit to pathology the tissue removed during his second operation speaks volumes as to exactly what type of operation he performed. And again, the court will look at the documents that form the appendix. It's page 18 of the appendix. It's the surgical pathology report from, again, Dr. Whelan who saved the patient's life, who used the vertical midline, ran the bowel, and submitted to pathology as he was required to do. The specimens that he removed during his surgery, which would be surgery number three. That didn't involve the defendant here. And if the court will look at that appendix, page 18 of the surgical pathology report, what jumps off the page is the description, both the gross description and the microscopic description, each of which go through a three-dimensional description of the tissue that's removed. All right. Thank you, Mr. Genske. You'll have some opportunity to read up. Mr. Maxey. Thank you, Your Honor. Counsel, I'm here with Dewey Kennedy, who tried the case, one of the trial lawyers. Your Honor, I listened to counsel, and with all due respect, he wants to retry this case before the appellate court. The issues that he raises were addressed at trial for the most part. The appendix issue obviously came up. The jury heard something about it. Everything was addressed, and the court makes rulings regarding evidence, instructions, exclusion of evidence, motions to eliminate, and they're all reviewed for an abuse of discretion. And there's nothing that I heard that constitutes an abuse of discretion by this trial court. Let me ask you about one thing. I asked Mr. Genske, did his expert testify that it was a breach of the standard of care to use the monopolar ESU? He said his expert did. Do you agree with that? I don't agree with that. I believe he says that it can be used, it has been used, and I believe that his complaint with Dr. O'Neill was that he felt that it was improperly used. Was there a factual issue established at trial as to whether or not it was negligence to use the monopolar ESU? Pardon me? Was there a factual issue at trial about whether or not it was negligence to use the monopolar ESU? I would say that there was testimony regarding it. Certainly Dr. Davis said that it wasn't his first choice. Certainly there were other witnesses that talked about it, but there was counter evidence as well that it was appropriate. I think Dr. O'Neill testified. So it was an issue? It could have been an issue. You weren't entitled to a directed verdict on that issue. You agree with that, don't you? I would, looking at Ms. Kennedy and whether we were entitled to a directed verdict, that would have been an issue. All right. Here's what I'm leading up to. On what basis does the trial court not allow the plaintiff to place that as an issue of negligence in the jury instructions, in the ESU's instruction? Because there was a jury instruction conference held. Everybody was aware of it. It was assumed at the time that he was dropping that claim. It was assumed. In other words, there's nothing in the record that says he was dropping that claim. There is nothing. He tethered his instructions. This was a preliminary conference. You agree with that, don't you? I wouldn't say it was preliminary. I'd say this was a jury instruction conference that was conducted. And any evidence that came in after that preliminary conference could not change what jury instructions would be submitted? Is that your argument? My argument is that by the time that that jury instruction was held, the plaintiff's case had closed. He did not tender a jury instruction that said anything about monopolar electrosurgical. We put Dr. DeBoe on the stand. It's not an issue of the case. We didn't raise it during his direct because it was not even raised. It was out of the jury instruction. So we assumed that it was no longer an issue. Okay. And so you didn't ask him to express his opinion about the monopolar ESU. And, okay, assuming, arguendo, you're right, that then any cross-examination would be outside the scope. Yes. What does that have to do if, during his case in chief, a factual issue was established as to that issue? What does that have to do with ultimately giving that issue to the jury? He did not – at the time of the jury instruction conference, he didn't bring that to the – Was there a jury instruction conference at the close of all the evidence? My understanding is that at the close of the evidence, the jury instruction conference was already in place from the day that we did this instruction conference. And then it went – It was formally put on the record after all the evidence. Is that what happened? Yes. I mean, that's the way it usually happens. Absolutely. But at the time, we didn't get a chance. And was everybody barred from making any other objections or anything that they hadn't already talked about? I mean, did the trial court say, if you haven't already brought it up, it's too late? I believe at the time that he read them to the jury that they had already had their formal jury instruction conference. That was done on the day that was set forth in the record. Instructions were made. We bring Dr. Dubow based upon the instructions that plaintiff tended. So I don't believe it's an abuse of discretion. Well, here's what I'm asking you about. Your argument to bar the plaintiff from adding this allegation of negligence to the issues instruction was based on your claim that you had the right to rely on the preliminary jury instructions that had been submitted at the informal jury instructions conference. I would say it wasn't the preliminary conference. That was the jury instruction conference. It wasn't even on the record, was it? I don't know because I don't believe so, but they did go through the instructions. Plaintiff tended to the instructions. But my question is, is that the basis of your claim that the plaintiff should be barred from including that issue of negligence was that you had the right to rely on what was submitted in this off-the-record preliminary jury instruction conference? We had the right to rely on that as well as when we brought Dr. Dubow, we had no idea that he had this claim still out there. Was it in his complaint? Was it in his complaint? Was this issue raised in his complaint? I don't recall. I can check that. Well, I mean, the reason I started asking questions about whether or not a factual issue had been established is, I mean, it really doesn't matter if a factual issue has been established as to whether or not that was an issue of negligence. I'm having a hard time understanding why he wouldn't get to submit that to the jury. Because he had an opportunity to submit jury instructions at the jury instruction conference that was held. Everybody agreed to that. He brought the jury. If it would be one thing if the defense had brought these instructions and left it off, the plaintiff brought the instructions. And was it your, did the judge say on the record, I'm not going to allow any further amendments, this is final? I believe it was understood by the parties that this was the final jury instruction conference that they were going to have. This is the day that he chose to do the instruction conference. The plaintiff brought their instructions there. They did not have his claim. I hear you saying the words understood and assumed. Is there anything in the record in which the judge says, you will not be allowed to amend these instructions after they're submitted in this off-the-record conference? At this point, I cannot answer that question. I don't know if that's correct. Were any instructions, and I haven't looked at the record on this, in the on-the-record jury instruction conference, were any instructions allowed to be amended? Yes, there were actually revisions made at that point, yes. At the instruction conference. I'm talking about the one that was on the record at the end of all the other days. Were any others amended? My understanding is there were no other new instructions, only at the conference the day before DeBoe's testimony, they went through all these issues. They made changes to the instructions at that point. Everybody agreed to them. The plaintiff did not come back at that point and say, oh, we've left this out. It didn't occur again until Dr. DeBoe had put him on, and then all of a sudden they come up with the process. It occurred to him before the final arguments. It occurred to him before the on-the-record jury instruction conference. And it occurred to him before it was submitted to the jury. Right? Because he submitted an amended instruction wanting to include that issue. He did submit an instruction at that point after our expert was done testifying, after our expert was done, then he submits that. Again, if it would have been before, perhaps he would have some sort of argument. It was after the fact that our expert came on. So your argument is you had the right to rely on your assumption that he had abandoned that allegation of negligence. We relied on the record. The record was he did not have a jury instruction regarding his claim. Dr. DeBoe would not have even helped his claim on that point anyway because Dr. DeBoe was going to testify that that was appropriate to do it. I'll let you go on to something else. Oh, thank you, Your Honor. Can I ask you a question? Please. With trepidation, yes. I understand. It appears that you're contending that both plaintiff and defendants agreed that the failure to send a surgical pathology specimen or surgical specimens of pathology did not cause or contribute to the injury. That's correct. Okay. Now plaintiff's counsel is saying that that evidence went to credibility, not causation. Is that correct? That's what the plaintiff says. Okay. So that's – tell me – I don't see how it goes to his credibility. His – Dr. Davis, which was the plaintiff's expert, testified that he only removed – he made a surgical hole of perhaps the size of a nickel, and that's the size of the tissue that was removed. But why wouldn't it come in just to dispute what they were contending? I mean, it is a credibility question. If somebody says, I sent it to pathology, but it really wasn't sent to pathology, wouldn't that be a credibility issue? Well, remember, Dr. O'Neill believed that he sent it to pathology. But it makes no difference whether he did or not. I understand it's a collateral matter. There's no relevance to this case whether – the plaintiff tries to make it appear relevant because it would have showed that he was lying. Well, he's saying that he was lying about the size of the material that he took from the body. And in reality, there was – everybody agrees that the size of the material was just a collateral matter. So your position is it's not relevant? It's not relevant. It has no basis. If it's not relevant, it's a collateral matter. Okay. There were other issues of alleged breach of standard of care about the actual cut that was made and whether a general surgeon should have been present. And again, these issues were for the jury. They looked at the issues, and a verdict was rendered. Dr. Whelan disagreed with the plaintiff's position on both the – whether there was a need for a general surgeon and the type of cut that was made that fell within the standard of care. Ultimately, when we get to the final analysis of this case, is that the errors that the plaintiff claims are really non-prejudicial for the most part. In fact, all of them are. We can say the one about the jury instruction conference, but again, that goes to an abuse of discretion of the trial court. The trial court sets a jury instruction conference. Somebody provides their instructions, the plaintiff brings their instructions, and it's just – for whatever reason, he didn't provide the instruction. We put the bill on him to provide the instruction then until afterwards. I don't believe the trial court abused its discretion in that point either. And unless the court has any other questions, I believe that I pretty much addressed most of the issues that the plaintiff raised. All right. Thank you, sir. Thank you very much. Any rebuttals, Mr. Finke? The informal jury instruction conference was not an informal jury instruction conference. In fact, some of the other instructions were changed. Judge Ball never said this is cast in stone. That would be a reversible error because there would be no point in having any more testimony. I mean, if those were the general instructions, you don't want the jury to get confused by having contradictory testimony thereafter. Dr. DePauw was still on the stand when this issue was raised. The only party that was prejudiced was Amy O'Connell. Counsel indicated that all four of the issues raised in the brief by the plaintiff are abuse of discretion issues. That is not true. Item number four, excuse me, item number three, failure to remove from the jury panel a patient of the defendant is not discretionary. The strongest cases on that point are the cases Marston and Grady that appear in all three briefs by the plaintiff. Well, assuming your standard review is correct, that juror was removed. Except it was removed by the exercise of a peremptory challenge on behalf of the plaintiff. And the cases discussing that issue say the prejudice is having to use a peremptory challenge, like there should have been a challenge with cause and the plaintiff would have had a peremptory challenge for another. But you didn't need to have another one, did you? You didn't use another peremptory challenge. Well, you only have so many peremptory challenges. Well, you weren't out when that juror was removed on a peremptory. You weren't out of peremptory challenges, I don't believe, were you? The fact that we had to use a peremptory challenge for a juror that should have been challenged for cause, standing alone, is prejudice to the party.  And that's a de novo review. That's not an abuse of discretion. I still stand by the analogy that I made earlier. It's clearly an abuse of discretion for a judge to say in a motor vehicle collision case, well, because the videotape doesn't have anything to do with the quotation, we're not going to allow the jury to see or know of that videotape because that would obviously favor one party or the other. Now, with reference to the last issue that we haven't touched upon, I got the impression that, quite frankly, some of the answers being offered by defense counsel were not adequate. That's a point that plaintiff raises on the field here, too. There were specific questions asked by the jury with respect to did the plaintiff have defendants that the judge refused to answer. One was, is there an appendix? Does she have an appendix or not? And the judge actually knew what the answer was. He knew that there were two witnesses, Dr. Brown and Dr. Davis, on behalf of the plaintiff that testified unequivocally. There were actually three. And Dr. Lee, all three testified that she didn't have her appendix. It was only the defendant that said she did have her appendix. All that the judge had to do was reiterate that, that four different positions have testified on that point. These three said she didn't. The defendant said she did. That's all he had to say. That does not misstate the facts. It doesn't put the trial court in a position of rendering any opinion whatsoever, and it answers the question, which the trial court should do. The other question raised by the jury was, can you give us some help with the phrase adequately examine or run the bowel? And the judge, again, punted that one and didn't answer it correctly. And we believe that the trial court has an obligation to try to help the jury when they say they're confused and answer the question rather than punt. I'm not sure even the word thoroughly would have adequately described taking the bowel out and running it hand-to-hand as you've described it here today. I don't disagree with that. But I think an attempt at helping the jury would have been preferable to simply not answering the question at all. Quick question, going back to this jury instruction about the monopolar PSU. I'm looking at you including in your appendix the answer to the complaint, which sets out your allegations. Is that where the plate stood when you went to trial? That I can't remember. When that question was being raised, Your Honor, I was looking to see if my appendix included the complaint or the amended complaint, and it doesn't, so I can't answer that question. Well, that's why I wondered. I don't see any allegation of that as an allegation of negligence in your complaint. And my other question was, was it amended at any time to include that allegation? I don't have the answer in the amended answer here. But lastly, and I want to make this point, too, the defendant, Dr. O'Neill, in his second operation, says he did not do a resection, a re-anastomosis, despite the fact that it was his very word and he changed his opinion at the time of his deposition. The point of all of the evidence concerning this pathology is that it would prove absolutely exactly what type of procedure he did. And if he actually did a resection and re-anastomosis, you'd be able to conclude that in the pathology report, which he was obligated to submit. Thank you. Thank you both for your... Yes, sir. I just want to make a point. I just went through a report on pages 29 and 31 of Dr. Davis' deposition. There was no deviation in standards there. I think I said it. Okay. All right. And, of course, we'll review the record. Thank you both for your excellent briefs and excellent arguments. We'll take this matter under advisement and issue our decision in due court.